# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**JONATHON LAMAR ALLEN,**

      **Plaintiff,**

                                    **Civil Action 2:20-cv-2663**
                                      **Magistrate Judge Elizabeth P. Deavers**

    **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

### OPINION AND ORDER

Plaintiff, Jonathon Lamar Allen ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income benefits.  With the consent of the parties pursuant to 28 U.S.C. § 636(c) (ECF No. 8), this matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 15) the Commissioner's Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 19), and the administrative record (ECF No. 14). For the reasons that follow, Plaintiff's Statement of Errors is **OVERRULED** and the Commissioner's decision is **AFFIRMED**.

### I.  BACKGROUND

Plaintiff applied for supplemental security income benefits on September 2, 2016, alleging disability beginning January 1, 2008.  (R. at 203-208.)  Plaintiff's claim was denied initially and upon reconsideration.  (R. at 102-108, 112-116.)  Upon request, a hearing was held

on March 19, 2019, in which Plaintiff appeared and testified.  (R. at 32-63.)[1]  A vocational expert ("VE"), Jerry Olsheski, also appeared and testified at the hearing.  (*Id*.)  On April 24, 2019, Administrative Law Judge Jeannine Lesperance ("the ALJ") issued a decision finding that Plaintiff was not disabled.  (R. at 13-31.)  On March 24, 2020, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 2-4.)  Plaintiff then timely commenced the instant action.  (ECF No. 1.)

## II.  RELEVANT HEARING TESTIMONY

### A.     Plaintiff's Testimony

Plaintiff testified at the March 2019 administrative hearing.  (R. at 39-56.)  Plaintiff testified that he lives alone and that he has not had a driver's license since 1996 but usually has a case manager to help take him places.  (R. at 39-42.)  Plaintiff also testified that he has a bus pass, but he doesn't use it because he doesn't like being around a lot of people.   (R. at 42.)  Plaintiff testified that he does not go to the library or go shopping for himself, and although he goes shopping or to the food bank, he has people who do the shopping for him.  (R. at 49.)

Plaintiff testified that he made it to the eleventh grade in school, but he did not finish due to his behavioral issues.  (R. at 42.)  Plaintiff testified that at one point in his life, he had a support group of good friends and enjoyed playing basketball, but now can't really explain what is going on inside of him and doesn't even remember being that way because he is on a lot of medicine.  (R. at 46-47.)

Plaintiff testified that he has tried to work over the years, and in 2015 he made about $2,500 from a part-time job that he received through a placement program.  (R. at 43.)  Plaintiff

---

[1] During the administrative hearing, Plaintiff amended the alleged onset date from January 1, 2008 to August 16, 2016.  (R. at 37.)

testified that he couldn't remember whether he worked at a job in 2014, but he could remember

working as a car washer for about six months in 2004. (R. at 43-44.) The ALJ characterized

Plaintiff's work history as "pretty patchy," noting that Plaintiff often wouldn't work anywhere

for more than a day or a week. Plaintiff confirmed, and indicated it was because he doesn't like

socializing with groups for a long time. (R. at 45.) The ALJ asked Plaintiff if there was a reason

why Plaintiff couldn't work a job that didn't require social interactions, such as a janitorial type

of position. Plaintiff testified that he couldn't explain it but "any little thing just can set [him]

off" so he just stays by himself at home. (R. at 45-46.)

Plaintiff testified that he drinks less alcohol than he used to because he is on so many

medications, and that he had been sober from alcohol and cannabis for six months. (R. at 47-48.)

The ALJ noted that Plaintiff has reported explosive anger episodes, but that the record doesn't

actually document that happening. He testified that he doesn't have problems when he is by

himself. (R. at 48.) Plaintiff represented that the last outburst he had was when he was working,

and "something popped in [his] head" and he was "just going through a lot of stuff." (*Id.*)

Plaintiff also testified that his medication has "somewhat" helped to control his outbursts. (*Id.*)

Plaintiff stated that he has always heard voices in his head, but he only recently reported it

because he was ashamed to say it previously. (R. at 49.)

Plaintiff testified that he used to live in specialized housing at Maryhaven, which Plaintiff

compared to a rehab center, and that he lived in a big "dorm-type room" with a lot of people. (R.

at 50-51.) Plaintiff testified that he got into a lot of altercations with people at Maryhaven, but

never faced any consequences. (R. at 51.)

Plaintiff testified that he suffers from severe depression and has suicidal thoughts, and

that he is on several different medications. (*Id.*) Plaintiff testified that he is aggravated and not

motivated to do anything, so he just likes to stay to himself. (R. at 51-52.) Plaintiff testified that his medications help, as he hasn't had any outbursts. (R. at 52.) Plaintiff testified that when he is around other people, he worries that they are talking about him or looking at him in a certain way, and he doesn't like it. (R. at 52-53.) Plaintiff testified that he does not have any friends he hangs out with, and that in a typical day he just watches TV and tries to sleep all day. (R. at 53.) Plaintiff also testified that he does not do anything on the internet, and that he talks to his mother but otherwise does not spend time with his family or a significant other. (R. at 53-54.)

The ALJ observed that Plaintiff's case manager had reported, at least seven or eight times, that Plaintiff was not home when the case manager came to his house. Plaintiff suggested that he was probably actually home, asleep, on those occasions. (R. at 54-55.) Plaintiff also testified that he was recently treated for his hand a couple of weeks ago, but had otherwise not seen a doctor for about a year. (R. at 55.) Plaintiff testified that he didn't know why he didn't seek treatment for his hand before then, but his case manager recommended it when Plaintiff complained about how much his hand hurt. (R. at 55-56.) Plaintiff testified that he was prescribed Ibuprofen for his hand pain at the most recent doctor's visit. (R. at 56.)

## B.    Vocational Expert's Testimony

Dr. Jerry Olesheski testified as the VE at the administrative hearing. (R. at 56-61.) Based on Plaintiff's age, education, and work experience and the residual functional capacity ultimately determined by the ALJ, the VE testified that a similarly situated hypothetical individual could perform the following jobs that exist in significant numbers in the national economy: machine feeder; packing and filling machine tender; and hand packer. (R. at 58-59.)

4

## III. RELEVANT RECORD EVIDENCE

### A. Maryhaven Inc.

Plaintiff received alcohol detoxification and rehabilitation treatment from Maryhaven Inc. ("Maryhaven") between July 31, 2014 and April 13, 2016. (R. at 280-307.) On an Adult Diagnostic Assessment form completed on August 8, 2014, Plaintiff reported that his strengths included "good personality, keeps people laughing, determined and smart, improvements self-esteem." He reported having a friend support group and that he enjoyed playing basketball. (R. at 286.) Plaintiff also reported wanting to work, and noted that he had had one job in the past five years. (R. at 287.) Plaintiff's record also indicated that he previously had been diagnosed with depression, anxiety, and bipolar disorder. (R. at 288.)

Plaintiff reported that he started drinking alcohol at age 12 and that prior to July 20, 2014, he drank alcohol "all day everyday." (*Id.*) Plaintiff also reported smoking marijuana (once per month) and tobacco (twenty cigarettes per day) prior to arriving at Maryhaven. (*Id.*) Plaintiff reported having had legal issues related to drugs and alcohol, and reported being addicted to alcohol and marijuana. (R. at 289-290.) Plaintiff was diagnosed with an alcohol dependency, and he began various treatment regimens, including education programs, long-term residential treatment, attending AA meetings every day, and meeting with a sponsor on a regular basis. (R. at 293.) On September 8, 2014, Plaintiff underwent a Mental Status Exam from Kathryn Jilek, LSW, who found that Plaintiff had no mental health impairments and that he had good insight and judgment. (R. at 296-297.)

On March 23, 2016, Teresa Soller, RN, completed a Nursing Assessment form for Plaintiff and reported that as of March 21, 2016, Plaintiff was drinking five 24-ounce beers on a daily basis and was smoking three blunts of marijuana on a biweekly basis. (R. at 280-285.)

Nurse Soller also reported that, prior to July 18, 2014, Plaintiff had been taking one pill of the opiate Percocet on a daily basis. (R. at 280.) Nurse Soller admitted Plaintiff for alcohol detoxification treatment. (R. at 284.)

On March 30, 2016, Plaintiff transitioned to seek "Ambulatory Detox" treatment. (R. at 303.) Stephanie Scales, LCDCIII, completed a Maryhaven Transition Summary form and indicated that Plaintiff "appears to have good insight into addiction/alcoholism," he "has a desire to make changes in his[] life," and he "reports having a good work ethic and good work history and experience." (*Id.*) Ms. Scales also noted that Plaintiff "is able to advocate for [him]self and participate effectively in an individual and group setting," but that he "would benefit from ongoing, community sober support." (*Id.*)

Plaintiff terminated the Ambulatory Detox treatment and was discharged on April 13, 2016. The Discharge Summary completed by Ms. Scales indicated that Plaintiff "did not meet all goals and did not complete[] Ambulatory Detox." (R. at 300.) Ms. Scales further noted that upon discharge, Plaintiff "needs to develop the strength to complete an [Alcohol Overuse Disorder] program," "needs to utilize familial support," "needs to continue to build sober social support," needs to attend 12-step recovery meetings, and needs to engage with his sponsor. (R. at 305.)

**B.    North Central Mental Health Center**

Between August 11, 2014 and February 15, 2019, Plaintiff received treatment and case management services from North Central Mental Health Center ("North Central"). (R. at 341-528.) After seeking treatment from North Central on a regular basis from August 2014 through February 2015, Plaintiff inexplicably did not return again until May 16, 2016, prompting psychiatrist Ayesha Haq, D.O. to note that Plaintiff "has no good explanation for not keeping his

appointments." (R. at 381.) Plaintiff then continued treatment on an infrequent basis from 2016 through 2019, often missing appointments and going several months between visits. (*See generally* R. at 341-528.)

Plaintiff had a similarly inconsistent experience with the case management services offered by North Central. The records indicate that the case management services were intended to help connect Plaintiff with community resources and provide transportation as needed, but Plaintiff regularly missed his scheduled appointments, again allowing several months to pass between some appointments. (*See* R. at 455 (On April 14, 2017, Plaintiff "did not answer" when his case manager knocked on his door), 459 (On July 17, 2017, Plaintiff "stated that he did not want to meet at this time"), 460 (On August 15, 2017, Plaintiff "stated that he did not want to meet"), 461 (On September 22, 2017, Plaintiff's case manager was unable to reach him), 462 (on October 20, 2017, Plaintiff "did not answer" when his case manager knocked on his door), 491 (on January 5, 2018, Plaintiff "stated he could not meet" for his appointment), 499 (on March 26, 2018, Plaintiff "did not answer" when his case manager knocked on his door), 500 (on May 3, 2018, Plaintiff's case manager was unable to reach him), 501 (on May 24, 2018, Plaintiff was not home when his case manager arrived for a scheduled meeting), 502 (on May 29, 2018, Plaintiff did not answer his case manager's phone call to schedule an appointment), 510 (on August 13, 2018, Plaintiff didn't open his door for his case manager and nurse), 511 (on August 16, 2018, Plaintiff was not at home for an appointment).)

## C.    Judith Brown, M.D.

On November 14, 2016, Plaintiff saw Judith Brown, M.D., for a physical examination, complaining of "right hand problems." (R. at 323-333.) Plaintiff reported breaking his hand in a fit of rage about five months prior, and despite surgical repair Plaintiff believed it had not yet

7

healed. (R. at 323.) Plaintiff reported a constant ache, decreased flexion of his fingers, and constant numbness, but denied problems with the range of motion of his wrist. (*Id.*) Plaintiff also reported that he had experienced shortness of breath of an unspecified period of time, but he had not sought treatment. (*Id.*)

Upon examination, Dr. Brown found that Plaintiff's extremities were normal, and his wrists were nontender and negative for Tinel's sign. (R. at 325.) Dr. Brown noted that Plaintiff's right hand revealed tenderness over the 4th and 5th metacarpal bones with a bony deformity of the proximal aspect of the 4th and 5th metacarpals, with mild soft tissues swelling. (R. at 326.) Dr. Brown also noted that Plaintiff was not able to make a fist with his right hand. (*Id.*) Dr. Brown noted some muscle weakness around Plaintiff's right hand, and concluded that Plaintiff's "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects appears to be at least mildly affected by the findings noted." (R. at 327.)

**D.     Margaret G. Smith, Ph.D.**

On December 12, 2016, Plaintiff saw Margaret G. Smith, Ph.D., for a psychological evaluation. (R. at 334-340.) Dr. Smith noted that when asked about the nature of his disability, Plaintiff reported that he broke his right hand and had surgery, but his hand was not healing properly and may require another surgery. (R. at 334.) Plaintiff also reported being treated for "mental issues," including depression, bipolar disorder, and schizophrenia. (*Id.*)

Dr. Smith noted that Plaintiff currently was taking Lexapro, which he had just started that week, and Melatonin. (R. at 335.) Dr. Smith reported that Plaintiff was "somewhat vague about this, but apparently he was off medication for about a month" and "[a]pparently he missed an appointment and his case manager quit." (*Id.*) Plaintiff told Dr. Smith that he drank regularly

8

throughout his life, and that he currently was living in a Maryhaven residential placement center following detox and treatment at Maryhaven.  (*Id.*)  Plaintiff reported that he was "sociable" with some of the guys at the center and that he had a good female friend he saw daily.  (R. at 336.)  Dr. Smith reported that the female friend was "the only one that can calm him down."  (*Id.*)

Dr. Smith reported that Plaintiff told her that he has mostly just had temporary jobs that have lasted a couple of weeks to a month, because he "can't put up with people," he doesn't trust people, and he thinks people are watching him.  (R. at 335.)  Plaintiff reported that he has been depressed his entire life, that he has had a "rough" life, and that he doesn't feel like he fits into society anymore.  (*Id.*)  Plaintiff reported to Dr. Smith that he gets angry very easily, which results in him punching things and getting into fights, and that he has little motivation.  (*Id.*)  Plaintiff also reported to Dr. Smith that he has "crazy stupid" thoughts, including paranoia, which makes him angry so he stays in his apartment, and that he previously saw a psychiatrist in 2008 but then quit going.  (R. at 336.)  Plaintiff also reported to Dr. Smith that he had been going to the North Central Mental Health Center for about two years, and that he had a case manager there.  (*Id.*)

Dr. Smith noted that "[m]anifest signs of anxiety were not observed" with Plaintiff, and opined that "[h]e [did] not present as psychotic during this interview."  (R. at 337.)  Dr. Smith also noted a previous evaluation of Plaintiff, noting that she "was concerned for the reliability of his reporting," but added that "his report from the last evaluation is generally consistent."  (*Id.*)  Dr. Smith diagnosed Plaintiff with Major Depression, Recurrent, Moderate; Alcohol Use Disorder, Reports in Remission; and Unspecified Personality Disorder (Antisocial and Borderline Traits).  (*Id.*)  Dr. Smith wrote that Plaintiff's symptoms "do support Major Depression and rule out Bipolar Disorder," and highlighted that "[i]t would be helpful to review

[the] psychiatric notes from North Central and to document that he has attended there." (R. at 338.)

With regard to a functional assessment of Plaintiff, Dr. Smith wrote that he "is an individual with probable borderline functioning," and added that he "is limited to basic simple tasks with a set routine." (*Id.*) Dr. Smith also opined that "[g]iven [Plaintiff's] low cognitive functioning it is not expected that he is competent to multi-task and it is expected that he would be highly distracted working with groups of people." (R. at 339.) Dr. Smith opined that "[i]t is not expected that he will be consistent in maintaining pace or persistence over prolonged periods of time." (*Id.*) Dr. Smith further found that Plaintiff has "low frustration tolerance and significant potential for explosive outbursts on the job," and added that "[w]ork pressures may exacerbate anger, paranoia, and aggression." (*Id.*) Dr. Smith did note, however, that she was not able to review any records from North Central as a part of the evaluation. (*Id.*)

## E.  State Agency Consultants

State agency consultant Maria Congbalay, M.D., reviewed Plaintiff's file at the initial level on December 12, 2016, and provided assessments of Plaintiff's physical RFC. (R. at 65-82.) Specifically, Dr. Congbalay found that Plaintiff could occasionally lift and/or carry up to 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk (with normal breaks) for about six hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; was occasionally limited in his right hand control with regard to his ability to push and/or pull (including operation of hand and/or foot controls); was frequently limited in climbing ramps/stairs; was never limited in climbing ladders/ropes/scaffolds, and crawling; and was unlimited in his balancing, stooping (i.e., bending at the waist), kneeling, crouching (i.e., bending at the knees); and was frequently limited in his crawling ability. (R. at 76-77.) Dr. Congbalay

found that Plaintiff was limited in his handling ability on his right side, but had no other postural, manipulative, visual, or communicative limitations. (R. at 77.) Dr. Congbalay also found that Plaintiff should avoid concentrated exposure to all hazards (machinery, heights, etc.). (R. at 78.)

State agency psychological consultant Judith Schwartzman, Psy.D. also reviewed Plaintiff's file at the initial level on January 4, 2017, and provided assessments of Plaintiff's mental RFC. (R. at 78-80.) Dr. Schwartzman found that Plaintiff was moderately limited in his ability to understand and remember detailed instructions, in that he could understand, remember, and perform simple tasks of 1-3 steps, but that Plaintiff was otherwise not significantly limited in his understanding and memory. (R. at 78.) Dr. Schwartzman also found that Plaintiff had sustained concentration and persistence limitations, including being moderately limited in his ability to carry out detailed instructions, moderately limited in his ability to maintain attention and concentration for extended periods, and being moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 79.) To this end, Dr. Schwartzman found that "[w]hen symptoms increase, [Plaintiff] will occasionally need flexibility in work schedule, taking breaks, and pacing." (*Id.*)

Dr. Schwartzman also found that Plaintiff had social interaction limitations, including being moderately limited in his ability to interact appropriately with the general public, moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors, moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and moderately limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.*) To this end, Dr. Schwartzman noted that Plaintiff "is easily frustrated and

11

prone to angry outbursts," and opined that "[h]e would perform best in a non-public position, preferably working alone" and "[h]e can engage in superficial, intermittent contacts with coworkers and supervisors" but "[s]upervisors will need to offer constructive criticism." (R. at 79-80.) Dr. Schwartzman also found that Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting, noting that Plaintiff "will need advance notice of major changes and a gradual implementation." (R. at 80.) Dr. Schwartzman concluded that Plaintiff "is capable of simple, repetitive tasks in settings where duties are relatively static, changes can be explained in advance, and he has superficial, intermittent interactions with others and no strict demand on production." (*Id.*)

Dr. Congbalay reviewed the opinions of Drs. Brown and Smith, affording them each "great weight" and noting that Dr. Smith's opinions were "consistent with the objective evidence in [the] file." (R. at 75-76.) Dr. Congbalay ultimately concluded that Plaintiff was not disabled, with the following explanation:

> You said you were disabled due to depression, anxiety disorder, bipolar, and a hand fracture. Although you may have some pain and discomfort, you are able to move about and perform normal activities. Although you may have some emotional problems, you are able to think, communicate, act in your own interest and pursue normal activities. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in [the] file, we have determined that you can adjust to other work. We are unable to establish disability under SSA guidelines.

(R. at 82.)

State agency consultant Leon D. Hughes, M.D., reviewed Plaintiff's file at the reconsideration level on March 26, 2017, and agreed with Dr. Congbalay's above assessments. (R. at 83-97.) State Agency consultant Jennifer Swain, Psy.D., reviewed Plaintiff's file at the reconsideration level on March 22, 2017, and agreed with Dr. Schwartzman's above assessments. (R. at 93-95.) With regard to the opinion evidence, Dr. Hughes found that Dr.

12

Smith's December 12, 2016 opinion was "consistent and supported by the overall medical and non medical evidence in [the] file," and added that Plaintiff "has some limitations in his ability to understand [and] remember, sustain concentration [and] persistent, interact socially and withstand stress [and] pressure." (R. at 90.) Dr. Hughes also found that Dr. Brown's opinion was "not supported by the medical and non medical evidence," adding that Plaintiff's impairments "are severe and limit him to medium-exertional work activities." (*Id.*) Dr. Hughes then also concluded that Plaintiff was "Not Disabled," and provided following explanation:

> You said you were disabled due to a hand fracture, anxiety, bipolar and depressive disorders. Despite your impairments, you are able to use your arms, hands, legs and back to perform some limited types of work activity. Although you may have some emotional problems, you are able to care for your own personal needs as well as understand and follow simple directions. We did not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in [the] file, we have determined that you can adjust to other work. While we recognize your conditions are serious, they are not so severe that you can be considered disabled.

(R. at 97.)

## IV. ADMINISTRATIVE DECISION

On April 24, 2019, the ALJ issued her decision. (R. at 13-31.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff has not engaged in any disqualifying

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.      Is the claimant engaged in substantial gainful activity?

    2.      Does the claimant suffer from one or more severe impairments?

    3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

    4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

substantial gainful activity since the alleged onset date of August 16, 2016. (R. at 18.) At step

two, the ALJ found that Plaintiff has the following severe impairments: depression; personality

disorder; alcohol use disorder; and history of right hand fracture with post-traumatic

osteoarthritis. (R. at 18-19.) The ALJ found that Plaintiff did not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) Then, at step four of the

sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, I find that the claimant has the
> residual functional capacity to perform medium work as defined in 20 CFR
> 416.967(c) except the claimant can frequently climb ramps and stairs, crawl, and
> finger with the right upper extremity and can never climb ladders, ropes, or
> scaffolds. Mentally, the claimant can perform simple, routine tasks at an average
> pace without strict time or production demands; can interact occasionally with co-
> workers and supervisors on matters limited to the straightforward exchange of
> information without negotiation, persuasion, conflict resolution, teamwork, or
> tandem work, but work duties should not require interaction with the general public;
> and can adapt to occasional changes that are explained.

(R. at 20-21.) The ALJ concluded that Plaintiff's "medically determinable impairments could

reasonably be expected to cause at least some of the alleged symptoms; however, [Plaintiff's]

statements concerning the intensity, persistence and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record for the reasons

explained in this decision." (R. at 22.)

The ALJ addressed each of Plaintiff's alleged impairments. First, the ALJ discussed

Plaintiff's major depression, personality disorder, and alcohol use disorder. (*Id.*) Specifically,

---

5. Considering the claimant's age, education, past work experience, and residual
   functional capacity, can the claimant perform other work available in the national
   economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster
v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

the ALJ discussed Plaintiff's psychiatric symptoms and history of alcohol use, as well as his

mental status examinations of record, case management services and counseling, and other

mental health treatment. (*Id.*) The ALJ also discussed Plaintiff's right hand fracture with post-

traumatic osteoarthritis, including the associated diagnostic tests and subsequent treatment. (R.

at 22-23.) The ALJ then discussed the opinion evidence of record, beginning with the State

agency consultants. (R. at 23-24.) As to the State agency psychological consultants, the ALJ

"adopted limitations consistent with the State agency determination" and afforded their

assessments "partial weight" for the following reasons:

> The State agency psychological consultants' mental assessments are given partial
> weight. Overall, I adopted limitations consistent with the State agency
> determination. However, the record does not support his subjective reports of
> uncontrolled outbursts. In fact, he is noted to travel with his case manager to
> numerous appointments for purposes of seeking various social benefits. While he
> is noted to be irritable at times, he is not noted to have any outbursts and is able to
> calm himself and complete necessary processes. He is cooperative at mental health
> appointments. He has no legal history during the period at issue in this case.
> Although some of these activities are remote, he is noted to be able to panhandle
> and go to the library and food banks. He often appears to be away from home when
> his case manager comes, she stated that he missed two appointments in 2018
> because he was "busy with some stuff," and he did apply for a COTA bus pass, all
> of which at least suggest greater engagement in the community than he describes.
> Additionally, he is noted more than once to want new housing as he found the rules
> in his current housing too restrictive, and one would not expect that to be a problem
> if he were isolating at home all the time. He admitted that he could get to his
> appointment without his case manager at least once. Based on the hearing level
> medical evidence of record, I do not find support for needing any special flexibility
> in work schedule, taking breaks, and pacing or that he would have any angry
> outbursts. Additionally, I do not adopt that supervisors must provide constructive
> criticism. The latter is not a characteristic of an occupation at all and thus
> inappropriate to include in a hypothetical to a vocational expert; rather it is a
> characteristic of an individual supervisor's personality. Moreover, if the State
> agency intended to suggest that the claimant required a form of special placement,
> such a finding is inconsistent with their determination of "not disabled." Again,
> while the record supports some irritability when frustrated, it does not support
> outbursts or inability to calm himself to complete tasks. On the State agency's
> initial review, they did not include as many limitations. I give more weight to the
> initial determination, as I adopted limitations that accommodate the same areas.
> However, I did not use the undefined term "superficial," but instead described

specific higher stress interactions that would be precluded. Therefore, the State agency mental assessments are given partial weight.

(*Id.* (citations omitted).)  The ALJ also considered the opinion of independent medical consultative examiner Dr. Brown, affording her opinion "partial weight."  (R. at 24.)  Finally, the ALJ considered the opinion of independent psychological consultative examiner Dr. Smith, and afforded her opinion "little weight" for the following reasons:

> The opinion of Margaret G. Smith, Ph.D., an independent psychological consultative examiner, is given little weight. I accept Dr. Smith's diagnoses, but note that he claimed that his alcohol abuse was in remission at that time, although the record has many reference to his drinking to at least some extent after this date. Additionally, he did not report cannabis use although that is also noted in file. Therefore, Dr. Smith was not given the opportunity to fully evaluate his substance use issues. I note that despite the social issues that he alleged, while he was initially subdued during her assessment, rapport was established. He also had only been on medication for four days at this time after being off medication for at least a month. He showed no signs of distractibility and his immediate memory was retained. The examiner noted conflicts at the last evaluation in connection with his 2016 filing between his reports and evidence. Here, he reported sobriety since 2014, which is patently false, as he attended detox in 2016. She did not observe him to be paranoid or attending to internal stimuli and noted specifically that he did not present as psychotic during the interview. Overall, I give her conclusions little weight to the extent that they suggest marked limitations in concentration, persistence, and pace, social functioning, or managing work stressors. For the reasons explained above, the record as a whole has few to no objective signs and symptoms to support the degree of limitation that he alleged, including having outbursts, paranoia, and hallucinations, as well as any degree of significant social anxiety. While the record supports irritability and moderate limitations in these areas, it does not support finding him more limited and the objective observations at this consultative examination do not otherwise support greater limitations. Therefore, Dr. Smith's opinion is given little weight.

(R. at 24-25 (citations omitted).)  Then, relying on the VE's testimony VE, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, he could perform jobs that existed in significant numbers in the national economy, including:  machine feeder; packing and filling machine tender; and hand packer.  (R. at 26.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act since filing the application on August 16, 2016.

(*Id.*)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

17

# VI. ANALYSIS

Plaintiff puts forth two assignments of error: that the ALJ failed to properly weigh the opinions of psychological consultative examiners, including the opinion of Dr. Smith, and that the ALJ failed to properly weigh the opinion of the State agency psychological consultants (the "State Consultants") who opined that Plaintiff was limited to occasional handling. (R. at 601-608.) Plaintiff argues that, by affording the State Consultants' mental assessments "partial weight" and Dr. Smith's opinion "little weight," the ALJ "rejected limitations . . . without providing appropriate reasons." (ECF No. 15 at PAGEID # 602.) With regard to the State Consultants' opinion, Plaintiff argues that the ALJ improperly concluded that the record does not support Plaintiff's reports of uncontrolled anger outbursts. (*Id.* at PAGEID ## 602-603.) Plaintiff also disagrees the ALJ's conclusion that constructive criticism "is a characteristic of an individual supervisor's personality," and argues that the necessity of constructive criticism is an accommodation and is not related to the characteristics of an individual supervisor. (*Id.* at PAGEID # 603.)

In response, the Commissioner argues that the ALJ properly evaluated Plaintiff's RFC and that substantial evidence supports the ALJ's finding that Plaintiff did not have limitations in handling. (ECF No. 18 at PAGEID ## 620-632.) As to Plaintiff's RFC, the Commissioner argues that the ALJ properly considered the objective medical evidence, opinions, and subjective allegations of Plaintiff, and specifically argues that the ALJ appropriately evaluated the opinions of Dr. Smith and the State Consultants. (*Id.* at PAGEID ## 620-629.) As to Dr. Smith's opinion, the Commissioner argues that the ALJ "identified inconsistencies between Dr. Smith's own examination findings and her opinion," and that the ALJ "reasonably concluded that because Dr. Smith was presented with an inaccurate picture of Plaintiff's history and impairments, her

opinion was not reliable." (*Id.* at PAGEID ## 620-625.) As to the State Consultants, the Commissioner argues that the ALJ "properly discounted the portions of the opinions that were inconsistent with the record as a whole" and "observed that the lack of evidence documenting angry outbursts and Plaintiff's demonstrated ability to travel independently, application for a public bus pass, and other evidence of socialization beyond that which he alleged showed he was not as limited as [the State Consultants] indicated." (*Id.* at PAGEID ## 625-629.) As to Plaintiff's limitations in handling, the Commissioner argues that "the medical evidence does not demonstrate Plaintiff had a hand impairment lasting at least twelve months," and concludes that "the objective medical evidence provided substantial evidence that the ALJ relied on in finding Plaintiff was not limited in his ability to handle." (*Id.* at PAGEID ## 629-632.)

In reply, Plaintiff argues that "Defendant attempts to contradict Plaintiff's argument concerning the ALJ's improper weighing of Dr. Smith's opinion through utilization of post hoc claims and inaccurate generalizations." (ECF No. 19 at PAGEID # 634.) Plaintiff takes issue with Defendant's argument that the ALJ properly identified inconsistencies in Dr. Smith's opinion, stating that the ALJ "lacks the medical training necessary for such opinions to have precedence over that of Dr. Smith's findings," and Plaintiff argues that Defendant repeatedly mischaracterizes the record. (*Id.* at PAGEID ## 634-635.) Plaintiff also generally argues that "it is Defendant's misunderstanding of the nature of mental illness, shared by the ALJ, which highlights the error throughout this decision." (*Id.* at PAGEID # 636.) As to the ALJ's opinion that Plaintiff was limited to occasional handling, Plaintiff argues that the Defendant's argument that Plaintiff's hand impairment did not last at least twelve months "is flawed as it undermines the ALJ's finding that Plaintiff suffers from a severe hand impairment in the first place." (*Id.* at PAGEID ## 638-639.) Plaintiff further argues that "[i]f the ALJ was dissatisfied with the

19

record's amount of hand injury treatment, then she had the responsibility to pursue more evidence." (*Id.* at PAGEID # 639.)  To this end, Plaintiff argues that "had the ALJ properly bolstered the record with additional medical evidence and included a handling limitation, the occupations proffered by the VE and incorporated in the ALJ's decision would have been eliminated" and "the ALJ's ultimate determination concerning Plaintiff's status as disabled would have been altered with the preclusion of these occupations." (*Id.* at PAGEID # 640.) Accordingly, the matter is ripe for judicial review.  The Court will analyze each of Plaintiff's arguments separately.

**A.**     **The ALJ Properly Weighed the Opinion Evidence of Record, Including the Opinions of the State Consultants and Dr. Smith.**

As a preliminary matter, the ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").  The applicable regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(1); *see also* SSR 96–8p, 1996 WL 374184, *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.").  Like other medical source opinions, the ALJ must consider state agency medical opinions.  *See* 20 C.F.R. § 416.913a(b)(1) ("Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 416.920b, 416.920c, and 416.927, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996) (administrative law judges are required to consider state agency medical

20

"findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and Appeals Council are not bound by findings made by State agency . . . but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.").

Regardless of the source of a medical opinion, in weighing the opinion, the ALJ must apply the factors set forth in 20 C.F.R. § 416.927(c), including the examining and treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the source. "In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, *3; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (state-agency medical consultants are "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act"; thus, in some cases, "an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating or examining source.") (first alteration in original) (internal quotation marks omitted); *Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 415 (6th Cir. 2004) ("State agency medical consultants are considered experts and their opinions may be entitled to greater weight if their opinions are supported by the evidence.").

To be clear, however, "there is no regulatory requirement that an ALJ adopt every facet of a particular medical opinion in formulating an RFC, so long as the record as a whole supports the RFC actually determined by the ALJ, and she adequately explains her analysis in a manner sufficient to allow review." *Kincaid v. Comm'r of Soc. Sec.*, No. 1:16-CV-736, 2017 WL 9515966, at *3 (S.D. Ohio June 12, 2017), *report and recommendation adopted*, No.

21

1:16CV736, 2017 WL 4334194 (S.D. Ohio Sept. 30, 2017). A disagreement with how the ALJ decided to weigh differing medical opinions "is clearly not a basis for . . . setting aside the ALJ's factual findings." *Id.* (citing *Mullins v. Sec'y of Health & Hum. Servs.*, 836 F.2d 980, 984 (6th Cir. 1987)).

Here, Plaintiff generally argues that by affording the State Consultants' opinions "partial weight," and by affording Dr. Smith's opinion "little weight," the ALJ "effectively disregarded these expert physicians' opinions that Plaintiff's severe mental impairments result in limitations in areas related to social interactions and workplace performance." (ECF No. 15 at PAGEID # 602.) Plaintiff further argues that the ALJ "rejected limitations within these opinions without providing appropriate reasons," which constitutes error." (*Id.*) As to the State Consultants' opinions, Plaintiff argues that the ALJ improperly found that "the record does not support his subject reports of uncontrolled outbursts" and improperly refused to adopt that "supervisors must provide constructive criticism." (*Id.* at PAGEID ## 602-603.) As to Dr. Smith's opinion, Plaintiff argues that the ALJ erred by only affording "little weight" to the opinion "because of its ability to strengthen the State agency psychologists' opinions." (*Id.* at PAGEID # 604.) Plaintiff further argues that the ALJ's "conclusion stating the record lacks objective signs and symptoms to support greater limitations is simply false," and that the ALJ's errors were harmful because she then improperly posed incomplete hypothetical questions to the VE.

Plaintiff's arguments are not well taken. For the reasons discussed below, the Court finds both that the ALJ sufficiently explained why she weighed the State Consultants' opinions and Dr. Smith's opinion the way she did, and that the ALJ's findings were supported by substantial evidence.

1.      **The State Consultants' Opinions.**

The Court first turns to the ALJ's analysis of the State Consultants' opinions, which reads

as follows:

> The State agency psychological consultants' mental assessments are given partial
> weight. **Overall, I adopted limitations consistent with the State agency
> determination. However, the record does not support his subjective reports of
> uncontrolled outbursts.** In fact, he is noted to travel with his case manager to
> numerous appointments for purposes of seeking various social benefits. While he
> is noted to be irritable at times, he is not noted to have any outbursts and is able to
> calm himself and complete necessary processes. He is cooperative at mental health
> appointments.  He has no legal history during the period at issue in this case.
> Although some of these activities are remote, he is noted to be able to panhandle
> and go to the library and food banks. He often appears to be away from home when
> his case manager comes, she stated that he missed two appointments in 2018
> because he was "busy with some stuff," and he did apply for a COTA bus pass, all
> of which at least suggest greater engagement in the community than he describes.
> Additionally, he is noted more than once to want new housing as he found the rules
> in his current housing too restrictive, and one would not expect that to be a problem
> if he were isolating at home all the time. He admitted that he could get to his
> appointment without his case manager at least once. Based on the hearing level
> medical evidence of record, I do not find support for needing any special flexibility
> in work schedule, taking breaks, and pacing or that he would have any angry
> outbursts. **Additionally, I do not adopt that supervisors must provide
> constructive criticism.** The latter is not a characteristic of an occupation at all and
> thus inappropriate to include in a hypothetical to a vocational expert; rather it is a
> characteristic of an individual supervisor's personality. Moreover, if the State
> agency intended to suggest that the claimant required a form of special placement,
> such a finding is inconsistent with their determination of "not disabled." Again,
> while the record supports some irritability when frustrated, it does not support
> outbursts or inability to calm himself to complete tasks. On the State agency's initial
> review, they did not include as many limitations. I give more weight to the initial
> determination, as I adopted limitations that accommodate the same areas. However,
> I did not use the undefined term "superficial," but instead described specific higher
> stress interactions that would be precluded. Therefore, the State agency mental
> assessments are given partial weight.

(R. at 24-25 (citations omitted; emphasis added).)  The Court finds that this explanation is

sufficient, as the ALJ set forth several compelling reasons, supported by substantial evidence, for

her decisions.

First, the Court agrees with the ALJ that "the record does not support [Plaintiff's] subjective reports of uncontrolled outbursts," and disagrees with Plaintiff that it is inconsistent for the ALJ to the cite to the fact that Plaintiff "is noted to travel with his case manager to numerous appointments for purposes of seeking various social benefits." (*Id.*) Plaintiff argues that this fact "supports the existence of severe psychological limitations," but that is not what is at issue. Rather, the ALJ was discussing whether the record supports Plaintiff's reports of uncontrolled outbursts. The ALJ reasonably concluded that the absence of any uncontrolled outbursts was significant in light of the "numerous appointments" Plaintiff spent with his case manager. (*Id.*) In further support of this conclusion, the ALJ cited to multiple instances in the record in which Plaintiff got "irritated" but was able to calm himself down. (R. at 24 (citing R. at 475, 483).) This substantial evidence actually helps the ALJ prove a negative (i.e., that the record does ***not*** support Plaintiff's reports of uncontrolled outbursts). Notably, Plaintiff fails to provide or cite to any record evidence to the contrary.[3]

For similar reasons, the Court also finds that substantial evidence supported the ALJ's decision not to include a "constructive criticism" limitation in Plaintiff's RFC. As Plaintiff affirmatively concedes, the State Consultants both "concluded that Plaintiff would require supervisors to offer constructive criticism because of his tendency to be easily frustrated and prone to anger outbursts." (ECF No. 15 at PAGEID # 603 (citing R. at 79, 94).) Because, as discussed above, the ALJ correctly found that the record does ***not*** support Plaintiff's reports of

[3] Plaintiff argues that "the record contains reports of instances where the Plaintiff required his case manager to assist him with navigating health care and Social Security claims in order to prevent frustration or angry outbursts." The Court, however, disagrees with Plaintiff's reading of the record. Plaintiff cites three pieces of evidence in the record for support, but none of Plaintiff's citations shows that Plaintiff needed assistance "in order to prevent frustration or angry outbursts" as Plaintiff suggests. (*See* ECF No. 15 at PAGEID ## 602-603 (citing R. at 390, 392, 475).)

uncontrolled outbursts, the ALJ also correctly rejected the State Consultants' accompanying "constructive criticism" limitation.

The Court therefore finds no error in the ALJ's analysis of the State Consultants' opinions, as the ALJ's analysis is supported by substantial evidence. Accordingly, the Court finds no merit to Plaintiff's first statement of error.

### 2. Dr. Smith's Opinion.

The Court next turns to the ALJ's analysis of Dr. Smith's opinion, which reads as follows:

> The opinion of Margaret G. Smith, Ph.D., an independent psychological consultative examiner, is given little weight. I accept Dr. Smith's diagnoses, but note that he claimed that his alcohol abuse was in remission at that time, although the record has many reference to his drinking to at least some extent after this date. Additionally, he did not report cannabis use although that is also noted in file. Therefore, Dr. Smith was not given the opportunity to fully evaluate his substance use issues. I note that despite the social issues that he alleged, while he was initially subdued during her assessment, rapport was established. He also had only been on medication for four days at this time after being off medication for at least a month. He showed no signs of distractibility and his immediate memory was retained. The examiner noted conflicts at the last evaluation in connection with his 2016 filing between his reports and evidence. Here, he reported sobriety since 2014, which is patently false, as he attended detox in 2016. She did not observe him to be paranoid or attending to internal stimuli and noted specifically that he did not present as psychotic during the interview. **Overall, I give her conclusions little weight to the extent that they suggest marked limitations in concentration, persistence, and pace, social functioning, or managing work stressors.** For the reasons explained above, the record as a whole has few to no objective signs and symptoms to support the degree of limitation that he alleged, including having outbursts, paranoia, and hallucinations, as well as any degree of significant social anxiety. **While the record supports irritability and moderate limitations in these areas, it does not support finding him more limited and the objective observations at this consultative examination do not otherwise support greater limitations.** Therefore, Dr. Smith's opinion is given little weight.

(R. at 24-25 (citations omitted; emphasis added).) The Court again finds that this explanation is sufficient, as the ALJ set forth several compelling reasons, supported by substantial evidence, for her decisions.

Specifically, the Court agrees with the Commissioner that the ALJ properly "identified inconsistencies between Dr. Smith's own examination findings and her opinion," and accordingly found Dr. Smith's opinion to be inadequate.  (ECF No. 18 at PAGEID # 622.) Specifically, the Commissioner correctly notes that Dr. Smith observed "no signs of anxiety, distractibility, paranoia, or psychosis," facts which unavoidably contradicted Dr. Smith's ultimate opinions regarding Plaintiff's ability to maintain concentration or pace, get along with people, and tolerate frustration.  (*Compare* R. at 336-337 ("There is no tangential/circumstantial thinking and associations were normal"; "Manifest signs of anxiety were not observed"; "Across the 50-minute interview he tracked the flow of conversation adequately. He did not show signs of distractibility"; "He does not present as psychotic during this interview.") *with* R. at 339 ("It [is] not expected that he will be consistent in maintaining pace or persistence over prolonged periods of time"; "There is low frustration tolerance and significant potential for explosive outbursts on the job"; "Work pressures may exacerbate anger, paranoia and aggression.".) Additionally, Dr. Smith's opinion relied in large part on Plaintiff's unsubstantiated subjective reports of uncontrolled outbursts.  (*See* R. at 339 ("The claimant reports a history of aggressive and acting-out behaviors . . . . He said sometimes he is sociable with others, but is easily frustrated and prone to angry outbursts.").)[4]  Unlike Dr. Smith, however, the ALJ was able to verify Plaintiff's complaints and determine that they were inconsistent with the record as a whole, as discussed above.  For these reasons, the Court finds that the ALJ properly discounted

---

[4] Plaintiff argues in his Reply brief that because "Dr. Smith never made such a statement in her opinion," it is false to suggest that Dr. Smith relied on Plaintiff's subjective complaints in forming her opinion.  (ECF No. 19 at PAGEID # 634.)  The Court rejects this suggestion on its face, as any plain reading of Dr. Smith's opinion makes clear that Dr. Smith relied, in large part, on Plaintiff's subjective complaints – even where, as discussed above, they were plainly inconsistent with her own observations.  (*See* R. at 334-339.)

Dr. Smith's opinion as internally inconsistent and as inconsistent with the record as a whole, and

that the ALJ's analysis is supported by substantial evidence.

**B.      Substantial Evidence Supports the ALJ's RFC Finding, Including as to Plaintiff's
          Limitations Regarding Handling.**

As to Plaintiff's second argument, the determination of a claimant's RFC is an issue

reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d).  Nevertheless, substantial

evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:08-cv-411, 2010

WL 3730983, at *8 (S.D. Ohio June 18, 2010).  An ALJ must explain how the evidence supports

the limitations that he or she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the
> evidence supports each conclusion, citing specific medical facts (e.g., laboratory
> findings) and nonmedical evidence (e.g., daily activities, observations). In
> assessing RFC, the adjudicator must discuss the individual's ability to perform
> sustained work activities in an ordinary work setting on a regular and continuing
> basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and
> describe the maximum amount of each work-related activity the individual can
> perform based on the evidence available in the case record. The adjudicator must
> also explain how any material inconsistencies or ambiguities in the evidence in the
> case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *7 (internal footnote omitted).

Here, Plaintiff argues that the ALJ "disregarded the State agency physicians' opinions

that Plaintiff has limitations from his broken hand" by determining that Plaintiff can "frequently

finger with the right upper extremity."  (ECF No. 15 at PAGEID # 606.)  Specifically, Plaintiff

contends that "[t]he ALJ's decision that Plaintiff's hand injury ought to limit his fingering rather

than his handling is not supported by the record," but rather "a mere estimate based on the ALJ's

lay understanding of the nature of Plaintiff's injury."  (*Id.* at PAGEID # 607.)  Plaintiff insists

that "[w]ithout a medical degree, it is impossible for the ALJ to arrive at such a conclusion."

(*Id.*)  Plaintiff cites **no** evidence from the record, however, in support of other hand limitations

beyond those in the ALJ's RFC.  (*See generally* ECF No. 15.)

On this issue, the ALJ thoroughly analyzed Plaintiff's broken right hand and his subsequent limitations as follows:

> The record indicates that the claimant has a history of right hand fracture with post-traumatic osteoarthritis. The claimant presented to the doctor in June 2016 complaining of right hand pain after punching a table. X-rays of the right hand at that time showed evidence of a displaced third metacarpal base fracture; a displaced, transverse fourth metacarpal shaft fracture; and right fifth carpometacarpal (CMC) fracture- dislocation. His right hand was placed in a splint. He subsequently underwent surgical repair of his fractures. At the consultative examination in November 2016, the claimant reported having ongoing right hand pain. Upon examination, the claimant had tenderness over the fourth and fifth metacarpal bones with a bony deformity of the proximal aspect of the fourth and fifth metacarpals and mild soft tissue swelling, but with no erythema, warmth, or atrophy. X-rays performed for that assessment revealed evidence of the previous fractures of the long, ring and little finger metacarpals with additional fracturing of the hamate body and probably of the scaphoid with some osteoarthritis. The record is generally silent as to any issues or treatment for his hand after his immediate period of recovery in 2016. The claimant mentioned having hand pain to his mental health provider in September 2018, but has not received any additional treatment for this condition. The claimant testified that he had health insurance at least as of December 2017. When asked why he failed to seek any medical treatment for physical issues since that time, he stated he was unaware of what was available. However, I do not find this explanation to be generally supported, as he had a case manager to assist him and there is no reason he could not have at least shared his complaints if he was having symptoms in his hand or elsewhere. Thus, while I considered his mild post- traumatic arthritis in limiting climbing (due to needing to hold rungs or hand rails), crawling and fingering, as well as limiting him to lifting at the medium level, this injury does not warrant further limitation.

(R. at 22-23 (citations omitted; emphasis added).) Once again, the Court finds that the ALJ's analysis is sufficient, and that her accompanying RFC – including as it relates to Plaintiff's right hand limitations – is supported by substantial evidence.

Instead of citing any record evidence which could support another RFC, Plaintiff merely argues that "the ALJ disregard the [State Consultants'] opinions that Plaintiff has limitations from his broken hand," which Plaintiff characterizes as "a blatant example of the ALJ playing doctor." (ECF No. 15 at PAGEID # 606-607.) The Court disagrees. As correctly noted by the Commissioner, the State Consultants evaluated Plaintiff's right hand less than a year after

Plaintiff suffered his injury in June 2016.[5] (*See* R. at 76-77 (Dr. Congbalay's assessment, dated January 4, 2017), 91-93 (Dr. Hughes' assessment, dated March 26, 2017).) At the time of the State Consultants' evaluations, Plaintiff's hand injury was recent, and he had sought treatment as recently as November 2016. (R. at 23.) By the time of the ALJ's Decision on April 24, 2019, however, the ALJ was able to consider the fact that "[t]he record is generally silent as to any issues or treatment for his hand after his immediate period of recovery in 2016." (*Id.*) To that end, the ALJ noted that in September 2018, Plaintiff mentioned having hand and wrist pain, but he had not treated it. (*Id.* (citing R. at 515).)

Accordingly, in the absence of any relevant medical record evidence, the ALJ looked to Plaintiff's testimony (from March 19, 2019) for guidance, and noted that Plaintiff himself testified that he only started treating his right hand "a couple of weeks ago" with Ibuprofen. (*Id.* (citing R. at 55-56).) Given the otherwise barren record regarding Plaintiff's right hand injury, the ALJ reasonably concluded that she "[did] not find this explanation to be generally supported, as he had a case manager to assist him and there is no reason he could not have at least shared his complaints if he was having symptoms in his hand or elsewhere." (*Id.*) The Court finds that the Commissioner's reliance on *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26 (6th Cir. 2009) is on point. The Court concludes that it is similarly clear here that the ALJ considered the many medical examinations and case management services appointments that occurred after the State Consultants' assessments in 2017, and properly relied on the record to take into account any

---

[5] Plaintiff argues in his Reply brief that the Commissioner's argument is inherently contradictory, as the ALJ identified Plaintiff's "history of right-hand fracture with post-traumatic osteoarthritis" as a "severe" impairment, which necessarily means it must have lasted for more than twelve months. (ECF No. 19 at PAGEID ## 638-639.) This argument is a red herring, however, because the ALJ did recognize Plaintiff's right hand limitation in her RFC – she simply declined to adopt all of the limitations from the State Consultants, for the reasons discussed herein.

relevant changes in Plaintiff's condition compared to when the State Consultants evaluated

Plaintiff. *See McGrew*, 343 F. App'x at 32. The ALJ was not "playing doctor," as Plaintiff

suggests, but rather was appropriately interpreting the record before her.[6]

Again, because her conclusion is supported by substantial evidence, the Court is

powerless to change it – even if the record could also support an opposite conclusion. *Nash v.*

*Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 6882255, at *4 (6th Cir. Aug. 10, 2020) ("Even if

the record could support an opposite conclusion, we defer to the ALJ's finding because it is

supported by substantial evidence, based on the record as a whole.") (internal citations omitted).

To be clear, an ALJ is not required to mirror or parrot medical opinions verbatim. *Poe v.*

*Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). While Plaintiff may have preferred

a different RFC than the one determined by the ALJ, the ALJ thoroughly explained the bases for

the RFC determination, including as it relates to the State Consultants' and Dr. Smith's proposed

limitations, and the ALJ's explanation enjoys substantial support in the record. *Dickinson v.*

*Comm'r of Soc. Sec.*, No. 2:19-CV-3670, 2020 WL 4333296, at *11 (S.D. Ohio July 28, 2020),

*report and recommendation adopted*, No. 2:19-CV-3670, 2020 WL 5016823 (S.D. Ohio Aug.

---

[6] The Court similarly rejects Plaintiff's suggestion, which Plaintiff raises for the first time in his
Reply brief, that the ALJ failed her duty to develop the record. (*See* ECF No. 19 at PAGEID ##
639-640.) To satisfy her heightened duty to develop the record, the ALJ must "scrupulously and
conscientiously probe into, inquire of, and explore for all the relevant facts," and she must be
"especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are
elicited." *Thrasher v. Comm'r of Soc. Sec.*, No. 1:12-CV-151, 2013 WL 486123, at *4 (S.D.
Ohio Feb. 6, 2013), *report and recommendation adopted*, No. 1:12-CV-151, 2013 WL 791882
(S.D. Ohio Mar. 4, 2013) (citation omitted). As discussed herein, the ALJ met her duty in this
case. It is not the ALJ's fault that the record does not include additional evidence to prove that
Plaintiff's hand injury is not as limited as the State Consultants evaluated it to be in 2017. The
absence of treatment records which do not exist (because Plaintiff admittedly did not treat his
right hand injury for years) does not mean that the ALJ failed to develop the record, especially
given the ALJ's appropriate probing of this issue during Plaintiff's administrative hearing in
March 2019.

25, 2020) (citing *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 649 (6th Cir. 2013); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.")). Under these circumstances, the Court finds no merit to Plaintiff's second statement of error.

## VII.  CONCLUSION

In sum, from a review of the record as a whole, the Cour concludes that substantial evidence supports the ALJ's decision denying benefits. Based on the foregoing, Plaintiff's contentions of error are **OVERRULED** and the decision of the Commissioner be **AFFIRMED**. The Clerk is **DIRECTED** to enter judgment in favor of Defendant and to terminate this case.

**IT IS SO ORDERED**.

Date: September 24, 2021                    /s/ *Elizabeth A. Preston Deavers*
                                            **ELIZABETH A. PRESTON DEAVERS**
                                            **UNITED STATES MAGISTRATE JUDGE**